IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURUS TECHNOLOGIES, INC. | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Civil No. 3:13-CV-03009-K |
| | § | |
| GLOBAL TEL*LINK CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## *MARKMAN* MEMORANDUM OPINION AND ORDER

Before the Court are the parties' briefs on the issue of claim construction of the patents-in-suit, U.S. Patent Number 7,742,581 ("the '581 Patent"), U.S. Patent Number 7,085,359 ("the '359 Patent"), and U.S. Patent Number 7,039,171 ("the '171 Patent"). The Court has reviewed the parties' briefs and all related filings and evidence, including the patents-in-suit, the specifications, the patent prosecution histories to the extent it was submitted by the parties, as well as the parties' proposed claim constructions.   The Court hereby construes the disputed claims according to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 360 (1996).

## I.   Background

### A.   Procedural

Plaintiff, Securus Technologies, Inc. ('Securus') initiated the current action by

filing *Plaintiff's Original Complaint for Patent Infringement and Demand for Jury Trial*. In the Plaintiff's complaint, it alleged that Defendant, Golbal Tel*Link Corporation ("GTL") infringed upon certain patents owned by or assigned to Securus. Securus' claims for patent infringement have been dismissed by the Court by grant of summary judgment in favor of Defendant. But, in the action, GTL asserted counterclaims against Securus, including an assertion that Securus infringed upon patents owned or assigned to GTL. The '581 patent, the '359 patent, and the '171 patent are these patents. Since, a dispute over these patents exists in this matter, it is necessary for the Court to construe the disputed claim terms of these patents.

**B.      The '581 Patent**

The '581 patent, entitled "Electronic Messaging Exchange," was issued by the USPTO on June 22, 2010. It was assigned to GTL who is the sole owner of the entire right, title, and interest in the '581 patent. The '581 patent relates to an invention used for monitoring of inmate communications with people outside of a prison. The patent discloses an invention that allows for an inmate to create messages, such as emails or text messages, to people outside of a prison and for an inmate to receive messages from people outside of a prison. As the messages are processed through the disclosed invention, they are analyzed and checked and/or intercepted by the prison so that the prison can monitor and control inmate communication.

### C.   The '359 Patent

The '359 patent, entitled "Investigation and Reporting of Inmate Security Threats," was issued by the USPTO on August 1, 2006. It was assigned to GTL who is the sole owner of the entire right, title and interest in the '359 patent. The '359 patent discloses an invention that monitors inmate involvement and association with security threat groups, such as gangs or criminal organizations. It discloses an invention for collecting information about the threat groups, collecting information about those individuals associated with the threat groups, and using the correlation between the two types of information to monitor the groups' and individuals' related activity. For example, when an inmate who is suspected of being in a gang dials a phone number that is also associated with that gang, the system will turn on a recording device to record the phone call and alert the prison staff.

### D.   The '171 Patent

The '171 patent, entitled "Method and System for Call Tracking to Discover Inmate-Employee Fraternization" was issued by the USPTO on May 2, 2006. It was assigned to GTL who is the sole owner of the entire right, title, and interest in the '171 patent. The '171 patent discloses an invention for detection of prison employee/inmate fraternization. It does this by monitoring inmate phone calls and associating and correlating those calls to known prison employee information. Doing so, the system can potentially indentify if any improper fraternization between an inmate and a prison

employee.

## II.    Applicable Law

### A.    Principles of Claim Construction

Claim construction is a matter of law. *See Markman*, 52 F.3d at 979. The Federal Circuit Court has held that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The Supreme Court has stated that the claims are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips*, 415 F.3d at 1312. A court looks to three primary sources when determining the meaning of claims: (1) the claims, (2) the specification, and (3) the prosecution history. *Markman*, 52 F.3d at 979. The claims of the patent must be read in view of the specification of which they are a part. *Id.* The specification consists of a written description of the invention which allows a person of ordinary skill in the art to make and use the invention. *Id.* This description may act as a dictionary explaining the invention and defining terms used in the claims. *Id.* Although a court should generally give such terms their ordinary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, so long as the special definition of the term is clearly stated in the patent specification or file history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court starts with the claim itself, read in light of the specification. *See Vivid*

*Technologies, Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999). While the claims themselves provide significant guidance as to the meaning of a claim term, the specification is generally dispositive as "it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1314-1315. In addition to the claim language and specification, the prosecution history is often helpful in understanding the intended meaning, as well as the scope of technical terms in the claims. *See Vivid*, 200 F.3d at 804. In particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning. Using these tools, the court construes only the claims that are in controversy and only to the extent necessary to resolve the dispute. *Vivid*, 200 F.3d at 803.

The words of a claim are usually given their ordinary and customary meaning. *See Phillips*, 415 F.3d at 1312. Ordinary and customary meaning is the meaning the claim term would have to a person of ordinary skill in the art (e.g., field of the invention). *See Id.* at 1313; *Markman*, 52 F.3d at 979. A person of ordinary skill in the art would read the claim term in the context of the entire patent, including the specification, not just the particular claim where the term appears. *Phillips*, 415 F.3d at 1313. There are instances where the ordinary meaning of claim language, as a person of skill in the art would understand it, "may be readily apparent even to lay judges," thereby requiring "little more than the application of the widely accepted meaning of

commonly understood words." *Phillips*, 415 F.3d at 1314. In these situations, general purpose dictionaries are useful. *Id.*

But, in many cases, the court must determine the ordinary and customary meaning of the claim terms which have a certain meaning in a field of art. *Id.* The court can look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* These sources can include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of the technical terms, and the state of the art." *Id.*

Aside from the written description and the prosecution history, the claims themselves also offer assistance as to the meaning of certain claim terms. *Id.*

When the intrinsic evidence, that is the patent specification and prosecution history, unambiguously describes the scope of a patented invention, reliance on extrinsic evidence, which is everything outside the specification and prosecution history, is improper. *See Vitronics*, 90 F.3d at 1583. While the Court may consult extrinsic evidence to educate itself about the invention and relevant technology, it may not rely upon extrinsic evidence to reach a claim construction that is clearly at odds with a construction mandated by the intrinsic evidence. *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

B.   "Means Plus Function" Language

Some of the disputed claim terms in this case deal with the use of so-called "means plus function" language. Generally, a court may not read limitations from the specification and prosecution history into the claims, despite the fact that claims often receive their interpretive context from the specification and prosecution history. *See Rambus Inc. v. Infineon Technologies Ag*, 318 F.3d 1081, 1088 (Fed. Cir. 2003). But, there is an exception to the rule that the Court does not import limitations from the specification. When a patentee avails himself of the statutorily authorized "means plus function" claim form, certain structural limitations from the specification are imported into the claim construction process. *See* 35 U.S.C. § 112, ¶ 6. Specifically, the statute provides that an element in a claim may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and the claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. *See Id.*

The intent of § 112, ¶ 6, is to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus. *See O.I. Corp v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). However, the use of means plus function language carries a price. *See Id.* Specifically, the price is that claimed function is limited to the means specified in the written description and equivalents thereof. *See Id.* As the Court of Appeals for the Federal Circuit (the "Federal Circuit") has stated, the

quid pro quo for employing § 112, ¶ 6 is the duty to link or associate structure in the specification to the recited function. *See Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1208 (Fed. Cir. 2002).

Use of the term "means" in a claim followed by a functional statement gives rise to a presumption that the patentee intended § 112, ¶ 6 to govern the claim's construction. *See Personalized Media Communications, LLC v. International Trade Com'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). This presumption can be overcome in two ways: (1) a claim element that uses the word "means" but fails to recite function corresponding to the means does not invoke § 112, ¶ 6; and (2) even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply. *See Allen Engineering Corp v. Bartell Industries, Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002). In order to recite "sufficient structure," a claim term, as the name for structure, has to have a reasonably well understood meaning in the art. *See Id.*

Even though a claim does not use the word "means" followed by a function, the claim may still be a means plus function claim. *Apple Inc. v Motorola, Inc*, 757 F.3d 1286, 1297-98 (Fed. Cir. 2014). This is true even though neither the patentee nor the USPTO identified the claim as a means plus function claim during patent prosecution. *Id*. But courts must "focus … on the claim terms the patentee chose" and should take care not "to rewrite a claim in means plus function format." *Id*. Under these

circumstances, there is a strong presumption that the claim is not means plus function claim. *Id*.

## III.   Construction of the Patent Claims and Terms

### A.   The '581 Patent Disputed Claim Terms/Phrases

For the '581 patent, the parties dispute the meaning and interpretation of the following phrases:

- "composition stations each for allowing a local user to create at least a first message in one of plural input methods," which occurs in Claim 1 of the '581 patent.

- "wherein at least one of said plurality of composition stations generates said at least said first message from a local user to said remote user," which occurs in Claims 1, and 4-6 of the '581 patent.

- "a multi-function unit for receiving said at least first message from the plurality of composition stations," which occurs in Claim 1 of the '581 patent.

- "a control platform coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user," which occurs in Claim 1 of the '581 patent.

The full language of all '581 claims is in the record before the Court and the Court has fully reviewed all the claims of the '581 patent, including those containing disputed

phrases. The Court finds no need to repeat the full claim language in this order.

**B.      Construction of Disputed '581 Claim Phrases**

**1.      "composition stations each for allowing a local user to create at least a first message in one of plural input methods"**

The parties dispute the construction of "composition stations each for allowing a local user to create at least a first message in one of plural input methods," which is found in Claim 1 of the '581 patent. Securus asserts that the claim is subject to 35 U.S.C. 112 ¶ 6, i.e. that the phrase is a means plus function limitation, even though the phrase is not written in a means plus function format. Securus asserts that "composition stations" should be read as "composition means." Furthermore, Securus asserts that there is no corresponding structure in the specification to perform the function. GTL asserts that the phrase is not subject to 35 U.S.C. § 112, ¶ 6 and that construction of the phrase is not necessary. In the alternative, GTL proposes that if the Court believes that construction is necessary but the phrase is not subject to 35 U.S.C. § 112, ¶ 6, then the phrase should be construed as "different composition stations each providing multiple input methods for allowing a local user to create at least a first message," and if the Court believes that construction is necessary and the phrase is subject to 35 U.S.C. § 112, ¶ 6 then the function should be "allowing a user to create at least a first message" and the structure should be "a writing surface for hand-written or typed text messages, a voicemail that converts voice to text, or a workstation for

sending or receiving messages."

The Court first addresses Securus' assertion that the claim is a means plus function claim. Securus argues that in the phrase "composition station" the word "station" is a nonce word, i.e a made up word that has no meaning of its own, since "station" is a nonce word it does not describe a structure, and since it is not a structure and it is combined with a function in the claim, it is actually a means plus function claim. Furthermore, Securus argues that there is no supporting structure recited in the specifications to perform the claimed function and because of this, the claim is invalid.

In response, GTL points out that during patent prosecution neither the patentee nor the USPTO identified the claim as a means plus claim and that the claim is not written in the standard means plus format, i.e. "means for [performing a function]." GTL points out that under these circumstances, there is a presumption that the claim is not a means plus function claim and argues that Securus has not come close to overcoming this presumption because the patent makes clear that the "composition station" of the claim is a structure.

The Court agrees with GTL that Securus falls short in overcoming the presumption that this claim limitation is not a means plus function limitation. The Court starts with the claim language itself. The claim recites a "composition station." While, the word "station" is somewhat generic, it is a structure. Common usage of the word "station" connotes a structure designed for some purpose, such as a train station

or a police station. A train station being a structure designed for trains to stop and passenger to get onto or leave trains. Likewise, a police station being a structure designed for police to carry out police business. In comparison, the Federal Circuit has provided examples of nonce words that do not impart any structure. These include words like "device," "element," and "mechanism." *See Mass Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354. This is not the case presented by this claim language. The term "composition station" connotes a physical structure that is designed for the purpose of composing a message.

The '581 specification also supports this interpretation. As pointed out by GTL, the specification describes an inmate being able to go to a composition station that is located in a correctional facility, ('581 patent at 7:65-66); describes that a composition station can a be terminal or a workstation, ('581 patent at 9:57-58) or a surface for writing or typing a message ('581 patent at 7:61-8:12). All of these descriptions of a composition station indicate that the composition station is a structural element of the claim and that the limitation recites sufficient structure so that it is not a means plus function limitation.

Because there is a presumption that this limitation is not a means plus function limitation, the claim language itself describes a structure, and the specifications describe a composition station as a structure the Court holds that this phrase is not a means plus function limitation.

The Court now turns to the proper construction of the phrase as a non-means plus function limitation. Securus does not provide a construction of this phrase as a non-means plus function limitation. GTL proposes that the phrase does not need any construction and in the alternative that the phrase should be construed as "different composition stations each providing multiple input methods for allowing a local user to create at least a first message." Securus responds that GTL proposed alternative construction does nothing to clarify the meaning of "composition station." The proposed construction simply repeats the words "composition station" and rearranges the other claim language, which is not helpful in clarifying the meaning of the phrase for a jury.

The Court disagrees with GTL's argument that the phrase does not need construction, and the Court disagrees with GTL proposed alternative construction. Securus is correct that GTL's proposed alternative construction does not do anything to help a jury understand what a composition station is, as used in the '581 patent. Simply reusing the phrase "composition station" and rearranging the order of the other words in the phrase does not help a jury understand what a composition station is. But, GTL, in its briefing does provide an adequate description of a composition station. GTL states that a composition station is "a location where an inmate is provided with the tools for drafting a message." Def. Resp. Brief at 6.

The claim language itself and specification support such an interpretation of

"composition station." The common usage of the word "station" connotes a physical location that is designed for some purpose. In this case, the modifier "composition" tells the reader what the purpose of the station is, i.e the purpose of the station is to provide an inmate with what is necessary to compose a message. The items necessary to compose a message are "the tools for drafting a message," just as GTL has described. The specification also supports this interpretation. The specification describes that the station is a location in a correctional facility and that the station has the tools that are necessary to draft a message, such as a workstation, terminal, or writing surface.

So, the Court is of the opinion that "composition station" should be construed accordingly. The Court holds that "composition station" means "a location where a user is provided with the tools for drafting a message." Regarding the remainder of the disputed phrase, the Court notes that Securus has not provided any non-means plus function construction and that GTL simply rearranges the words in the phrase. Neither of these is help to explaining the phrase to a jury. The Court is of the opinion that no construction of this portion of the phrase is necessary. For these reasons, the Court refuses to construe this portion of the phrase. In summary, the Court holds that the phrase "composition stations each for allowing a local user to create at least a first message in one of plural input methods" means "locations where a user is provided with the tools for drafting a message, each for allowing a local user to create at least a first message in one of plural input methods."

2.    **"wherein at least one of said plurality of composition stations generates said at least said first message from a local user to said remote user"**

The parties dispute the meaning of the phrase "wherein at least one of said plurality of composition stations generates said at least said first message from a local user to said remote user," which occurs in Claims 1 and 4-6 of the '581 patent. Securus argues that the phrase should be construed to mean "one or more of the multiple composition stations brings into existence the message created by the local user." GTL argues that the phrase should be construed to mean "wherein at least one of the plurality of composition stations is used to generate at least first message from a local user to said remote user." There are two points of dispute in the construction of this phrase. The first revolves around the use of "said at least said first message;" the second is a dispute over the word "generates."

Regarding the dispute over "said at least said first message," Securus contends that this language indicates that the first message that is generated in this limitation must be the exact same message that a user created using the composition station. Securus argues that since this must be the exact same message, the message cannot be in another form and it cannot be a copy or a duplicate of the message created by the user. GTL argues that Securus is over analyzing the use of "said" and that this usage does not indicate that this has to be the exact same message as asserted by Securus. In addition, GTL argues that a message is not defined by the form or medium that the

message is in; it is defined by the informational content expressed.

The Court agrees with GTL that in its usual meaning a message is not limited to a particular form or medium. In its usual meaning a message is information that is sent to someone. The message does not vary based on how it is communicated. For example, a written message can be read to one's self or the same written message can be read out loud, the message remains that same. The information that is conveyed is the same information regardless of the form of the message. So, when the phrase refers to "said at least said first message," it does not matter what form the message is in. What matters is that the informational content of the message is the same as it was in the first message. Securus' interpretation of this phrase is incorrect because it limits the meaning of the phrase to exclude this concept. So, the Court refuses to adopt this interpretation.

Regarding the second dispute of this phrase, Securus contends that "generate" should be construed to mean "brings into existence." GTL asserts that "generate" should be construed to mean "is used to generate." From the proposed constructions, it is clear that this is not actually a dispute over the definition of "generate." Securus proposes a construction that provides a normal meaning of generate. But, GTL's proposed construction does not. It simply adds "is used to" in front of "generate." GTL's proposed construction does not define generate. What it does is to change the meaning of the limitation.

The limitation states, "… one of said plurality of composition stations generates … said first message." As Securus points out, a plain reading of this limitation makes it clear that it is a composition station that generates a message. GTL's proposed construction changes this limitation so that the composition station is used to generate a message. These are two different situations. In the first the composition station must actually bring this message into existence. In the second, the composition station is merely a way for a user to bring the message into existence.

GTL contends that the plain reading of this limitation should not be applied in this case because this would create ambiguity in the claim overall. The ambiguity comes from the fact that other limitations require the user to create the message and to now require the composition station to generate the message is contradictory. GTL also argues that imposition of a plain reading of this phrase would read out preferred embodiments. For example, it would exclude the embodiment in which an inmate uses paper and pencil to draft a message. In this case, the composition station would be used to generate the message, but it could not be said that the composition station itself generated the message.

Securus argues that the plain reading of this limitation should be applied because the language is clear and using GTL's proposed construction would change the meaning of that language.

The Court agrees with Securus that the claim limitation language is clear and

that if GTL's construction was adopted, this would improperly change the meaning and scope of the limitation. There can be no dispute that the plain meaning of "… one of said plurality of composition stations generates … said first message" means that a composition station is what generates the message. To change this clear language to other language that allows the composition station to be "used to generate" a message would change the scope and meaning of the limitation.

In addition, GTL's argument that imposing the plain meaning of these words creates ambiguity is not correct. GTL argues that having the user compose a message and having the composition station generate the same message are at odds with each other. But, this does not prevent use of composition stations in which the user inputs the message directly into the composition station. A computer or workstation is an example of this type of system. The user composes the message with the composition station and the composition station generates the message simultaneously.

GTL is correct and the parties agree that imposition of a plain reading of this language would exclude embodiments that are disclosed in the specification. The Court notes that constructions that exclude disclosed embodiments are disfavored. But, at the same time, the limit of protection provided by a patent is defined by the claims. In this case the plain meaning of the claim language is clear. The language is not ambiguous or difficult to understand. It does not use any technical jargon or words of art. A lay person could read the language and understand exactly what it conveys. That is, that

the composition station generates the message. The patentee is free to choose the wording of the claims and the public should be able to rely on those words to define the extent of the patent protection. In this case, the patentee choose to require the composition station to generate the message instead of requiring that the composition station be used to generate the message. The patentee is limited to the wording chosen and the courts are not in a position to expand upon those words, especially when, as in this case, the plain meaning is clear. In addition, there is no requirement that a patentee seek coverage of everything that is disclosed in a specification. A patentee may disclose an invention in the specification and not claim protection of that invention in the claims, if the patentee chooses to do so. Whether that was the case here or the case is that the patentee carelessly drafted the claim language does not make any difference to the analysis. The public is entitled to rely on what is claimed and the Courts cannot change the scope or meaning of what is claimed.

In summary because a message is defined by its informational content and not its form and because the limitation is clear that a composition station generates a message, the Court construes the phrase "wherein at least one of said plurality of composition stations generates said at least said first message from a local user to said remote user" to mean "one or more of the multiple composition stations brings into existence the message created by the local user."

      **3.**    **"a multi-function unit for receiving said at least first message from**

the plurality of composition stations"

The parties dispute the meaning of the phrase "a multi-function unit for receiving said at least first message from the plurality of composition stations." Securus asserts that the limitation is subject to 35 U.S.C. § 112, ¶ 6, i.e. that the limitation is a means plus function limitation, that the function is "receiving said at least said first message from the plurality of composition stations" and that there is no corresponding structure in the specification to perform this function. GTL asserts that the limitation is not subject to 35 U.S.C. § 112, ¶ 6, and that the phrase does not need any construction.

In support of its argument, that the phrase is a means plus function limitation, Securus argues that the limitation is a mean plus function limitation because "multi-function unit" does not recite sufficient structure plus it is followed by a functional description. So, Securus argues, "multi-function unit" should be read as "multi-function means." In response, GTL argues that "multi-function unit" recites structure because the specification indicates that the multi-function unit is a physical device, the specification shows the connectivity of the multi-function unit, and the described capabilities of the multi-function unit indicate that it is structural and not purely functional. In addition, the presumption that the limitation is not a means plus limitation applies because the limitation is not written in standard means plus format and because the patentee and the USPTO did not identify the limitation as a means plus limitation during patent prosecution.

The Court agrees with GTL that '581 patent describes the multi-function unit sufficiently as a structural component, so it is not a means plus function limitation. In this case, the patentee chose the word "unit" to describe this limitation, which is a generic word that it could be considered a nonce word that does not indicate any structure. But, the descriptions of the multi-function unit in the specification of the '581 patent sufficiently describe the unit as a structural component to overcome the indication that the "unit" is used as a nonce word. This is particularly true in light of the presumption against subjecting the limitation to 35 U.S.C. § 112, ¶ 6. Figure 1 of the '581 patent shows the connections to the multi-function unit. In this figure, the multi-function unit is shown as being between a composition station and a conversion engine. The connections to and from the multi-function unit indicate that the unit is a structural component of the disclosed invention. But, the figure depicts the multi-function unit as a black box. It does not inform the reader of what the multi-function unit actually is, which supports a determination that the limitation is subject to 35 U.S.C. § 112, ¶ 6. Other portions of the specification, however, fill in some of the gaps left by Figure 1. The specification describes the multi-function unit as capable of scanning messages composed by inmates, which indicates that the multi-function unit is a scanner. '581 Patent at 8:23-40. It also describes the multi-function unit as being capable of printing message received by inmates from those outside of a correctional facility, which indicates that the multi-function unit is

also a printer. '581 Patent at 5:19-20. Securus argues that these specification descriptions are purely functional descriptions that do not describe a structure. But, a description in functional terms, such as "scanning" or "printing," does not necessarily mean that there is no structure associated with that function. This is particularly true in the case of devices like printers or scanners, which are named after their function. In addition, the multi-function unit of the '581 patent must also necessarily be "multi-function." This is important because it prevents the patentee from simply referring to a printer or a scanner in the specification. In doing so the patentee would run the risk of distinguishing the multi-function unit from a printer or a scanner, when in the patent the scanner and the printer are the same device, i.e. the multi-function unit.

The claim language itself also supports a determination that the multi-function unit is a structural component. The claims indicate that the multi-function unit is connected in some way to the composition stations because the multi-function unit receives messages from the composition stations; that this multi-function unit is coupled to a control platform; and that the multi-function unit receives messages from remote users. '581 Patent at 13:25-14:14. The requirements of the claim indicate connections between the various structural components of the claim, including the multi-function unit. The descriptions in the claims are also consistent with the connectivity description presented in the in Figure 1. They are also consistent with the

scanning/printer capabilities describe in the specification. The connectivity descriptions and the functional descriptions that are associated with a physical structure that are provided in both the claims and the specification are more than enough to show that the multi-function unit is a structural component. This is particularly true in this case, were there is a presumption that the multi-functional unit is structural. For these reasons, the Court refuses to adopt Securus' position that multi-function unit limitation is a means plus function limitation.

The Court now turns to the construction of the phrase, as a non-means plus function limitation. Securus only provided the Court with a means plus construction of the phrase and does not provide the Court with a proposed alternative construction if the Court found that the phrase is not a means plus function limitation. GTL only proposes that multi-function unit does not need any construction. The Court disagrees with GTL that the phrase does not need construction. As discussed above, "multi-function unit" alone does not convey very much information what the device actually is. This is the same problem presented by the black box description of the multi-function unit in Figure 1 of the '581 patent. Not construing at least the "multi-function unit" portion of the phrase leaves it wide open to interpretation of the lawyers and the imagination of the jury. But, this would not be proper as the specification provides some understanding about the "multi-function unit." It specifies that the multi-function unit is at least both a scanner and a printer. Also, as just

discussed, the claim language itself supports an interpretation that the multi-function unit is at least a printer and a scanner. The Court is of the opinion that these criteria should be incorporated into the construction of "multi-function unit." Doing so is in line with the specification and the claims. It also clarifies that the unit is multi-function because it is capable of at least two functions, scanning and printing. For these reasons, the Court construes the phrase "a multi-function unit for receiving said at least first message from the plurality of composition stations" as "a multi-function printer and scanner unit for receiving said at least first message from the plurality of composition stations."

**4.    "a control platform coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user"**

The parties dispute the interpretation of the phrase "a control platform coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user." Securus asserts that this phrase is subject to 35 U.S.C. § 112, ¶ 6, i.e. that it is a means plus function limitation. Securus argues that "control platform" does not recite sufficient structure. Securus argues that the function should be "transmitting said at least first message to a remote user and receiving a second message from said remote user" and that the specification fails to disclose a structure that is capable of performing

this function. GTL asserts that the phrase is not a means plus function limitation and that the no construction is necessary. In the alternative GTL proposes, if the limitation is not a means plus function limitation and the Court believes construction is necessary, the phrase should be construed as "a control platform connected to said multi-function unit via a communications medium, where the control platform transmits said at least first message to a remote user and receives a second message from said remote user" and if the Court believes that the limitation is a means plus function limitation the function should be "transmitting at least first message to a remote user and receiving a second message from said remote user" and the structure that performs this function is "a computer containing one or more servers."

Regarding the dispute over whether or not this limitation is a means plus function limitation, Securus argues that "control platform" does not recite structure and should therefore be read as "control means" and be subject to 35 U.S.C. § 112, ¶ 6. GTL argues that the a "control platform" is a known structure in the telecommunications field that is used to route and processes calls and messages and that the descriptions of the functions and connectivity of the control platform provided in the specification indicate that this is what the claim language is referring to.

The Court agrees with GTL that the a control platform is a structural component of the limitation. As in the limitations discussed above, this limitation is not written in standard means plus format, and neither the patentee not the USPTO identified this

limitation as a means plus function limitation during patent prosecution. Under these circumstances, there is a presumption that the limitation is not a means plus function limitation. In this case, this presumption is not rebutted. The claim language itself indicates that the control platform is structural. '581 patent at 13:25-14:24. The claim identifies that the control platform is connected to the multi-function unit. Being able to connect the control platform to another structure indicates that the control platform itself is also a structure. The specification and Figure 1 further describes the connectivity of the control platform that is consistent with the claim language. Figure 1 of shows the control platform connected to the multi-function unit and the specification recites that the control platform is connected to the multi-function unit via an internet protocol connection. '581 Patent at 8:23-40. In addition, the specification describes some of the structural components of the control platform, such as "one or more server." '581 patent at 10:26-42, 13:37-40. The specification even indicates that a "telephonic communication platform" is "known in the art." '581 patent at 10:43-11:21.

The specification and the claims also describe some of the functions of the control platform that indicate that the control platform is a known structure in the telecommunications filed and that a person of ordinary skill in the art would understand this. Id. The specification indicates that the control platform is able to process, prepare, and route message and to perform security checks and encrypt

messages. While these are certainly functional descriptions of the control platform, the functional descriptions provided are the same functions that a "telephonic communication platform" that is known in the art would perform and a person of skill in the art would understand that this is what is being referred to in the claim language. This all indicates that the "control platform" limitation of the phrase does recite structure. This is particularly true in light of the presumption that the "control platform" is a structure. For these reasons that Court holds that the limitation is not a means plus function limitation.

Regarding the construction of the phrase as a non-means plus function limitation, Securus has not provided the Court with any proposed construction of the phrase. GTL has proposed that the phrase does not need to be construed and in the alternative that the phrase be construed to mean "a control platform connected to said multi-function unit via a communications medium, where the control platform transmits said at least first message to a remote user and receives a second message from said remote user."

The Court disagrees with GTL's assertion that the phrase does not need to be construed. As just discussed, the specification indicates that the control platform is a specialized telecommunications device. The phrase needs construction because a jury is not likely to have the knowledge needed to correctly understand what this device is. GTL's proposed construction is not helpful in understanding the phrase. GTL simply

repeats "control platform," and the remainder of GTL's proposed construction only makes minor changes to the wording and rearranges that other wording. This does not help a jury understand the meaning of the phrase.

As already discussed, the specification indicates that a "control platform" is a specialized device in the telecommunications industry for processing and routing calls. Inclusion of this concept in the claim construction will assist a jury in understanding the meaning of the phrase. Therefore, the Court is of the opinion that this concept should be included in the claim construction. For these reasons the Court construes the phrase "a control platform coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user" as "a message processer and router coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user."

C.     The '359 Patent Disputed Claim Terms/Phrases

For the '359 patent, the parties dispute the meaning and interpretation of the following phrases:

- "second information regarding inmates known to be affiliated with the security threat groups," which occurs in Claims 1 and 13 of the '359 patent;

- "information regarding inmates known to be affiliated with the security threat groups from the plurality of correctional facilities," which occurs in Claim 4 of

the '359 patent;

- "information regarding … inmates known to be affiliated with the security threat groups," which occurs in Claim 14 of the '359 patent; and

- "regularly updating," which occurs in Claim 6 the '359 patent.

The full language of all '359 claims is in the record before the Court, and the Court has fully reviewed all the claims of the '359 patent, including those containing disputed phrases. The Court finds no need to repeat the full claim language in this order.

### D.     Construction of Disputed '359 Claim Phrases

### 1.     The "Information" Phrases

The parties dispute the meanings of "second information regarding inmates known to be affiliated with the security threat groups," "information regarding inmates known to be affiliated with the security threat groups from the plurality of correctional facilities," and "information regarding … inmates known to be affiliated with the security threat groups." These three phrases share common points of dispute between the parties. Within the phrases, the parties dispute 1) whether it is necessary to clarify a distinction between "information" and "second information"; 2) the meaning of "known to be," as it is used in the phrases; and 3) the meaning of "affiliated" as it is used in the phrase. Because the three phrases share common points of dispute, the Court will collectively construe these phrases. For convenience, the Court will refer to all of these phrases as the "information" phrases.

Regarding the dispute of whether or not it is necessary to make a distinction in the claim construction of the phrases of the difference between "information" and "second information," Securus argues that this distinction should be made and proposes that the constructions include "information (different from the first stored information regarding security threat groups) …." GTL asserts that this is not necessary and that it may lead to jury confusion.

In support of its argument, Securus argues that based on the claim language and specification language, there are at least two types of information. The first type being the information regarding security threat groups. The other type of information being the information regarding the inmates' association with security threat groups. Securus asserts that it is necessary to include additional language in the claim constructions to   point out this distinction.

GTL acknowledges and agrees that there are two distinct types of information. But, GTL contends that it is not necessary to include in the claim construction any language that points out that the information that this claim language is referring to is different from the security threat group information.

The Court is of the opinion that it is necessary to point out this distinction in the claim construction. While, Claim 1 is clear that there are the two types of information are different sets of information; Claim 14 is not. Claim 1 indicates that there is a difference between the two types of information. Claim 1 of the '359 patent reads in

part, "a method … comprising: storing *first information* regarding security threat groups; storing *second information* regarding inmates …." emphasis added. The fact that the two sets of information are different sets of information is made clear by the claim language distinguishing the sets of information as a "first information" and "second information."

But, this is not clear in Claim 14. Claim 14 reads in part, "a system, comprising: a memory to store: information regarding security threat groups and inmates known to be affiliated with the security threat groups…" and "… an analysis module to analyze the communication detail records against the information regarding security threat groups and inmates known to be affiliated with the security threat groups…" '359 Patent at 13:30-41. Claim 14 does not make clear that the security threat group is different set of information from the inmate information. As written, the claim language could be read so that the there is only one set of information and that single set of information regards both security threat groups and inmates. The parties, however, both acknowledge that this is not the case. Securus actively argues that this is not the case. GTL acknowledges that the first and second informations of Claim 1 are distinct, but asserts that it is not necessary to point out this distinction. Furthermore, GTL presents its argument regarding the issue collectively and does not argue that the there is a distinction between the sets of information in Claim 1 from those of Claim 14. So, the Court is of the opinion that because the parties agree that the sets of

information are unique and Claim 14 does not make this clear construction of these phrases should include this distinction.

The parties' second dispute of these phrases relates to the meaning of "known to be" as it is used in the phrases. Securus proposes that the Court construes "known to be" as "apprehended with certainty when such information is stored …, in actual fact, …." GTL argues that no construction of "known to be" is required.

In support of its argument that "known to be" should be construed to mean "apprehended with certainty when such information is stored …, in actual fact, …," Securus argues that this construction is necessary to achieve the fundamental objective of the '359 patent. Securus argues that the fundamental objective of the '359 patent is "indentifying telephone call activities that pose potential security threats," and that it is not possible to do this unless the connection between an inmate and a security threat group is ascertained with certainty at the time the information is stored, … in actual fact." Securus appears to argue that it would impossible to indentify actual security threats (as opposed to potential security threats) with knowing with certainty in actual fact that the inmate was associated to a security threat group. In this argument, Securus appears to assert that the disclosed invention only identifies actual security threats and does not identify potential security threats.

GTL, in support of its position that "known to be" does not need any construction, argues that Securus' proposed construction would improperly limit the

meaning of known because there is no support in the patent to impart any degree of certainty to what is "known." GTL points to the specification language that discusses how one might associate an inmate with a security threat group. This language indentifies "observing behavior, decoding graffiti, observing body markings, clothing arrangements, handshakes, and the like" ('359 patent at 1:42-45) and "monitoring inmate's telephone conversations" ('359 patent at 1:45-49) as ways of determining if an inmate is associated with a security threat group. GTL argues that these identification methods do not provide any certainty and in fact are they are inherently uncertain methods of "knowing" something.

The Court agrees with GTL that it would not be correct to include Securus' strict knowledge requirement in the claim constructions because this would improperly limit the claim language. As GTL points out, there is no support in the patent for imposing a degree of certainty to "known to be" beyond that which the common usage of "known to be" already connotes. In addition Securus' proposed construction goes beyond simply adding some degree of certainty. The proposed construction adds a required degree of certainty that goes well above and beyond the normal usage of "known to be." In addition, the examples in the patent of how one "knows" that an inmate is associated with a security threat group show that the patentee's understanding of "knowing" is far from Securus' proposed construction. In addition, "known to be" is not a phrase that is beyond that grasp of a lay juror. For the reasons, the Court holds that there is no need

to construe "known to be," and that the phrase shall be given its usual meaning.

In addition to the parties dispute over the certainty of "known to be," the parties also dispute when this information must be known. In its proposed construction of "known to be," Securus includes a temporal limitation. Securus' construction requires that an inmate's association with a security threat group be known at the time the second information is stored. So, Securus asks that the constructions also include "when such information is stored." Securus argues that this is necessary for the claims to function as described in the '359 patent. GTL argues that there is no basis in the extrinsic record to include Securus' proposed temporal limitation of "when such information is stored" in the claim constructions. GTL asserts that inclusion of this temporal limitation will improperly limit the claims because it excludes embodiments describing the update of the databases. GTL argues that it is possible that at the time information is stored a connection between an inmate and a security threat group may not have been made, but upon subsequent updates a connection may be made and the information could be correlated to previously recorded information.

The Court disagrees with GTL. As Securus points out, the claimed invention is not one that is used to identify inmates that might be associated with a security threat group. The invention is one that uses the connection between a known association of an inmate with a security threat group, information about the security threat group, and communication records to identify probable security threats. In order to do this,

one must first know that an inmate is associated with a security threat group. The claim language itself requires this. For example, Claim 1 read in part: "storing second information regarding inmates known to be affiliated with the security threat groups." The inmate information that is stored is only information for inmates that are already known to be associated with a security threat group. The system does not simple record all of the inmate information and then afterwards make a connection between an inmate and a security threat group, as presented by GTL in its briefing. According to the claim language, if there is not a known connection between an inmate and a security threat group at the time the information is recorded, then there is no information to record. So, the connection must be made at least by the time the inmate information is stored. For these reasons, the Court agrees with Securus that "when such information is stored," should be included in the constructions to specify that the inmate and security threat group association is already made at when the inmate information is stored.

The third dispute over the information phrases is over the meaning of "affiliated with the security threat groups." Securus proposes that "affiliated with the security threat groups" means "have been adopted … as members of the security threat groups with respect to which first information has been stored." GTL argues that no construction of this portion of the information phrases is needed.

In support of its argument that "affiliated with the security threat groups" means

"have been adopted … as members of the security threat groups with respect to which first information has been stored," Securus points to the specification of the '359 patent. The relevant specification portions read: "In response to the identification of a growing number of security threat group affiliated inmates in correctional facilities … (DOCs) have attempted to identify, validate and certify street gang members who are incarcerated in their systems," ('359 patent at 1:32-37) and a database data format template will include "Security Threat Group Detail Record," "STG Code-Affiliated security threat group Code,: and "GangLevel-Inmate's level in security threat group." ('359 patent at 6:36-7:10). Securus argues that this specification language indicates the patentee's intent to record the inmate as "members" of a security threat group.

In response, GTL argues that "affiliated" is not confined to "members" of a security threat group. GTL argues that Securus' proposed construction of "affiliated with the security threat groups" improperly restricts the claim language beyond it normal meaning because there is no support or evidence in the patent to impose Securus' limited meaning of affiliated.

The Court agrees with GTL that Securus' proposed construction would improperly limit the claim language. The specification language cited by Securus does indicate that membership in a security threat group is affiliation with a security threat group. It also indicates that an inmate's level with the security threat group may be recorded in the database. But, the specification language does not limit affiliation with

a group as being a member in a group. It merely provides an example of a possible type

of affiliation. Being "affiliated" with a security threat group has a substantially broader

meaning than being a "member" of a security threat group. For example, a first inmate

may be engaged in an illicit business deal with a second inmate who is a member of a

security threat group. This may be an affiliation of the first inmate with the security

threat group, even though the first inmate is not an actual member of the security

threat group. Or, an inmate may desire to become member of a security threat group.

To achieve this goal, the inmate may routinely interact with multiple members of the

security threat group. In this case the inmate is associated with the security threat

group, but is not a member of the group. The patentee chose to use the broader

"affiliated" in the claim language and should be afforded that broader coverage in claim

construction. If the patentee wanted the invention to relate only to "members" of a

security threat group, the patentee could have used "member" in the claim language or

purposefully defined "affiliated" to mean only "member" in specification. Neither of

these is the case at hand. The usage and meaning of "affiliated" the claims and

specification is not any different from the customary usage and meaning of "affiliated."

For these reasons, the Court holds that no construction of "affiliated" is necessary. The

term shall be given its usual meaning. In addition, the Court notes that Securus also

requested that the construction include "with respect to which first information has

been stored." Securus, however, has not provided any supporting briefing or argument

to support inclusion of this phrase in the claim construction. So, the Court declines to include this language in construction of the information phrases.

Because "known to be" does not need construction, clarification that the security threat group information is a different set of information than the inmate information is necessary, an inmate association with a security threat group must be known at the time the information is stored, and "affiliated" does not need construction the Court construes the information phrases as follows:

- "second information regarding inmates known to be affiliated with the security threat groups" is construed as "second information regarding inmates, different from the first stored information regarding security threat groups, known to be affiliated with the security threat groups when such information is stored."

- "information regarding inmates known to be affiliated with the security threat groups from the plurality of correctional facilities" is construed as "information regarding inmates, different from the stored information regarding security threat groups, known to be affiliated with the security threat groups from the plurality of correctional facilities when such information is stored."

- "information regarding … inmates known to be affiliated with the security threat groups" is construed as "information regarding … inmates known to be affiliated with security threat groups when such information is stored."

2.     "regularly updating"

The parties dispute the meaning of the phrase "regularly updating" as used Claim 6 of the '359 patent. Securus asserts that the phrase should be construed to mean "revising the first information and the second information at fixed times or uniform intervals to include the latest facts." GTL asserts that the phrase does not need any construction. The Court agrees with GTL that no construction is needed for the phrase "regularly updating."

Securus argues that "readily updating" means "revising the first information and the second information at fixed times or uniform intervals to include the latest facts" because, Securus argues, the patent uses the phrase in a manner consistent with its proposed construction, the proposed construction is consistent with extrinsic evidence, and the specification specifically clarifies that updating includes adding the latest facts about inmates to the database.

Securus argues that the patentee uses the term "regularly" to mean at fixed or uniform intervals. In support of this argument Securus points to specification language that reads, "In one example, information from TIES database 202 and DOTS database 205 is downloaded on a regular basis, for example, every day…" ('359 patent 4:14-35) and "In order to keep the database current, the DOCS will send updates to the security threat group database to the communications provider on a regular basis, e.g., a DOC uploads the data file to an FTP server each day." ('359 patent 7:26-33). According to

Securus, these specification statements support its proposed construction.

In support of its assertion that a construction of regularly updating should include the limitation that the latest facts are included in the update, Securus points to the specification language that reads: "Both databases are updated frequently as information concerning inmates changes and inmates move in and out of the correctional facility" ('359 patent at 3:66-4:13). Securus argues that this language supports inclusion of the "latest facts" limitation in the claim construction.

GTL argues that the phrase "regularly updating" does not need any construction because it is a phrase that is readily understood by a lay juror and it is not used in the claims in any manner different than its ordinary lay meaning. GTL further argues that Securus' proposed construction improperly narrows the claim language because there is no support in the '359 patent for importation of this narrow limitation into the claim language.

The Court agrees with GTL that the phrase "regularly updating" does not require construction. The specification language does not support Securus' contention that regularly updating should specifically be limited to fixed times or uniform intervals. The language in the specification that Securus uses to include this limitation describes updating every day or on each day. '359 patent at 4:14-35; 7:26-33. While updating every day or on each day would in fact be fixed time or uniform interval, there is nothing in the specification that indicates that regularly updating must be at a fixed

time or uniform interval. The patent certainly does not impose this definition of "regularly" on the claim language and there is no indication that are person of ordinary skill in the art would read this and think that this is what the patentee meant by using the term regularly. These specification examples are simply examples of what regularly could be and there is no reason to limit the construction to fixed times or uniform intervals. In addition, regularly could possibly include other schedules than fixed times or uniform intervals. For example, a system that is set up to update the database when a certain amount of new or changed information is acquired, may be considered regularly updated, even though this is not going to occur at a fixed time or a uniform interval because it is dependent on the amount of new or changed data acquired.

The Court is also not persuaded by Securus' argument that regularly updating should be construed to include the limitation that the latest facts about the inmates are always included in the update. Securus' only support for inclusion of this limitation is the specification language that reads: "Both databases are updated frequently as information concerning inmates changes and inmates move in and out of the correctional facility" '359 patent at 3:66-4:13. This specification language does not even use the phrase latest facts. Securus offers no argument how this language should change the meaning of a readily understood phrase and the Court refuses to import this specification language as a claim limitation.

Because "regularly updating" is used in the '359 patent with its normal usage,

the normal usage will be readily understood by a lay juror, and there is no indication that the patentee intended to limit the meaning of the phrase the Court holds that no construction of "regularly updated" is necessary. The phrase will be given the meaning of its normal usage.

### E.    The '171 Patent Disputed Claim Terms

For the '171 patent, the parties dispute the meaning and interpretation of the following terms:

- "fraternization" and "fraternizing," which occur in Claims 1, 8, 9, 16, 17, and 23 of the '359 patent;

The full language of all '171 claims is in the record before the Court and the Court has fully reviewed all the claims of the '171 patent, including those containing disputed phrases. The Court finds no need to repeat the full claim language in this order.

### F.    Construction of Disputed '171 Claim Terms

### 1.    "fraternization" and "fraternizing"

The parties dispute meaning of the term "fraternization" and of "fraternizing" as they are used in claims of the '171 patent. Securus asserts that "fraternization" means "association in an intimate way" and that "fraternizing" means "associating in an intimate way." GTL asserts that the terms do not need any construction. The Court agrees with GTL that the terms do not need any construction.

In support of its proposed construction, "association/associating in an intimate

way," Securus argues that the meaning of the terms is critical to understanding the scope of the claims and that a person of skill in the art would not understand how to practice or avoid practicing the limitations without further defining the terms. Securus further argues that the patentee has given the terms specific meanings in the claims, specifications, and prosecution history.

In support of its argument, that the claims and specifications define the meanings of the terms, Securus points to dependent Claims 8 and 16, which constrict fraternization to "potential fraternization." It argues that this further limitation upon "fraternization" makes it necessary to construe the fraternization terms. Securus also points to examples of fraternization described in the specification of the '171 patent. The specification describes that "improper inmate-employee fraternization can be sexual in nature" or "more likely occurs for purposes of economic gain (e.g. smuggling illegal materials into and out of the correctional facility." '171 patent at 1:36-52. Securus argues that this description of fraternization supports its proposed construction because of the language of the specification indicates that the patentee meant fraternization to connote an intimate, collaborative, albeit illicit, relationship.

Securus further points to the prosecution history to argue that fraternization must be something more than just an illegal phone call from an inmate to an employee. Securus points to a exchange of communications between the patentee and the USPTO, in which, Securus argues, the patentee distinguished the claims of the '171

patent from mere detection of illegal phone calls between inmates and employees.

GTL asserts that the terms do not need any construction at all and that to adopt Securus' proposed construction would improperly narrow the meaning of the claim. In support of this argument, GTL points out that Securus' proposed construction requires that fraternization be intimate, but that the specification provides examples of fraternization that is not intimate. For example, GTL points to the same specification language that Securus argues shows intimacy and argues that the sexual nature fraternization example of the patent is intimate but the smuggling of illegal drugs example is not intimate. Since, GTL argues, the specification includes a non-intimate example of fraternization, construction of the terms cannot limit the meaning to intimate relationships.

In response to Securus' argument that GTL defined the scope of the terms during prosecution history, GTL argues that Securus misinterprets the meaning and implications of the exchanges between the patentee and the USPTO and that the exchange actually indicates that Securus' proposed construction is incorrect.

The Court agrees with GTL that there is no need to construe "fraternization" and "fraternizing" because in the '171 patent, usage of the terms does not indicate that the patentee meant the terms to mean anything different from their normal meanings and because the prosecution history does not support limiting the meaning of the terms beyond their normal meanings.

In regards to Securus' argument that the claims and specifications indicate that fraternization must be intimate, the Court simply does not find any support for this. Dependent Claims 8 and 16 do further limit "fraternization" to "potential fraternization," as pointed out by Securus, but this limitation does nothing to help understand the meaning of fraternization. It merely indicates a difference between actual and potential fraternization. This does not does not do anything to define fraternization. It simply makes a distinction between something that is occurring and something that might be occurring. Securus' argument that the specification supports limiting fraternization to something intimate also fails to convince the Court to adopt Securus' construction. As pointed out by GTL, the examples of fraternization given in the specification are not necessarily limited to intimate relationships. An agreement between an inmate and an employee regarding the smuggling of contraband into a prison does not have to be intimate. So, limiting fraternization to intimate relationships would improperly limit the claim language. In addition, use of the word intimate in a claim construction could add more uncertainty to the claim meaning than it would resolve. The word intimate can imply different meanings to different people. This can be seen in the parties' own briefing. Securus on one hand argues that the examples provided in the specification are intimate. GTL on the other hand, has a narrower view of intimate, which only calls the sexual nature example intimate. Therefore, adding intimate into the claims, will only add more uncertainty to the claim

meanings.

In regards to Securus' argument that GTL limited the definition of the terms during patent prosecution, the Court is of the opinion that Securus misinterprets the meaning and implications of the communications between the patentee and the USPTO. As pointed out by GTL, in this exchange, the patentee used the fact that the invention could identify phone calls between inmates and employees to distinguish the invention from the prior art. The patentee discussed this distinction in an Amendment dated July 15, 2005. Securus Opening Brief Appx at 835-36. In a previous office action the examiner had rejected this claim as being unpatentable over two pieces of prior art, the Brown reference and the Gainsboro reference. In this amendment, the patentee asserts that patentability of Claim 1 of the amendment over this prior art. The patentee explains that neither reference discloses or suggests the method of detection of fraternization of the amendment and that the detection of fraternization distinguishes Claim 1 of the amendment over the prior art. Securus argues that somehow, these statements of the patentee limit the meaning of fraternization so that fraternization cannot include the mere detection of illegal telephone calls. The Court disagrees. The statements made by the patentee do no such thing. In addition, Securus' proposed construction does nothing to address its belief that fraternization cannot include the mere detection of illegal phone calls. Securus' proposed construction merely limits fraternization to an intimate association.

Because "fraternizing" and "fraternization" are used in the '171 patent with their normal meaning, those meanings would be readily understood by a lay jury and there is nothing in the prosecution history that would indicated another meaning of the terms the Court hereby holds that there is no need to construe either term. The terms are to be given their usual meaning.

**SO ORDERED.**

Signed   January 27th , 2015.


_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE

**SUMMARY CHART OF CLAIM CONSTRUCTIONS OF DISPUTED TERMS**

## Disputed Terms of the '581 Patent

| Language of Disputed Priority Term of Claims | Securus' proposed Construction | GTL's Proposed Construction | Judge's Construction |
|---|---|---|---|
| Claim 1:<br><br>"composition stations each for allowing a local user to create at least a first message in one of plural input methods" | This claim limitation is governed by 35 U.S.C. § 112, ¶ 6.<br><br>Function: "for allowing a local user to create a first message in one of plural input methods"<br><br>Structure: specification fails to disclose adequate structure; claim is invalid; in the alternative structure is "a pre-printed form for composing a hand written of typed text message, or a safe terminal or workstation" | No construction required.<br><br>To the extent the Court believes claim construction is required, "different composition stations each providing one of multiple input methods for allowing a local user to create at least a first message"<br><br>If the Court construes this phrase to be subject to 35 U.S.C § 112, ¶ 6:<br><br>Function: "allowing a user to create at least a first message"<br><br>Structure: "a writing surface for hand written or typed text messages, a voice mail that converts voice to text, or a workstation for sending or receiving messages" | The claim limitation is not governed by 35 U.S.C. §112, ¶ 6.<br><br>"locations where a user is provided with the tools for drafting a message, each for allowing a local user to create at least a first message in one of plural input methods." |
| "wherein at least one of said plurality of | "one or more of the multiple composition | "wherein at least one of the plurality of | "one or more of the multiple composition |

| | | | |
|---|---|---|---|
| composition stations generates said at least said first message from a local use to said remote user" | stations brings into existence the message created by the local user" | composition stations is used to generate said at least first message from a local user to said remote user" | stations brings into existence the message created by the local user." |
| "a multi-function unit for receiving said at least first message from the plurality of composition stations" | This claim limitation is governed by 35 U.S.C. § 112, ¶ 6.<br><br>Function: "for receiving said at least said first message from the plurality of composition stations"<br><br>Structure: specification fails to disclose adequate structure; claim is invalid | No construction is required.<br><br>If the Court construes this phrase to be subject to 35 U.S.C. § 112, ¶6:<br><br>Function: "receiving at least the first message from the plurality of composition stations"<br><br>Structure: "multi-function scanner" | This claim limitation is not governed by 35 U.S.C. §112, ¶ 6.<br><br>"a multi-function printer and scanner unit for receiving said at least first message from the plurality of composition stations." |
| "a control platform coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said remote user" | This claim limitation is governed by 35 U.S.C. §112, ¶ 6.<br><br>Function: "transmitting said at least first message to a remote user and receiving a second message from said remote user"<br><br>Structure: specification fails to disclose adequate structure; claim is invalid | No construction is required.<br><br>To the extent the Court believes construction is required: "a control platform connected to multi-function unit via communications medium, where the control platform transmits said at least first message to a remote user and receives a second message from said remote user" | "a message processer and router coupled to said multi-function unit via communications medium for transmitting said at least first message to a remote user and for receiving a second message from said first user." |

| | | If the Court construes this phrase to be subject to 35 U.S.C. § 112, ¶6:<br><br>Function: "transmitting said at least first message to a remote user and receiving a second message from said remote user"<br><br>Structure: "a computer containing one or more servers" | |
|---|---|---|---|

## Disputed Terms of the '359 Patent

| Language of Disputed Priority Term of Claims | Securus' proposed Construction | GTL's Proposed Construction | Judge's Construction |
|---|---|---|---|
| "second information regarding inmates known to be affiliated with the security threat groups" | "information (different from the first stored information regarding security threat groups) about inmates of a correctional facility who, it has been apprehended with certainty when such information is stored, have been adopted, in actual fact, as members of the security threat groups with respect to which first information has been stored" | No construction required | "second information regarding inmates, different from the first stored information regarding security threat groups, known to be affiliated with the security threat groups when such information is stored." |
| "information regarding inmates known to be affiliated with the security threat groups from the plurality of correctional facilities" | "information (different from the first stored information regarding security threat groups) about inmates of multiple correctional facilities who, it has been apprehended with certainty when such information is stored, have been adopted, in actual fact, as members of the security threat groups (with respect to which first | No construction required | "information regarding inmates, different from the stored information regarding security threat groups, known to be affiliated with the security threat groups from the plurality of correctional facilities when such information is stored." |

| | information has been stored) from all of the multiple correctional facilities" | | |
|---|---|---|---|
| "information regarding … inmates known to be affiliated with the security threats groups" | "information (different from the first stored information regarding security threat groups) about inmates of correctional facilities who, it has been apprehended with certainty when such information is stored, have been adopted, in actual fact, as members of the security threat groups (with respect to information has been stored in memory)" | No construction required | "information regarding … inmates known to be affiliated with security threat groups when such information is stored." |
| "regularly updating" | "revising the first information and the second information at fixed times or uniform intervals to include the latest facts" | No construction required | No construction necessary. Phrase is to be given its usual meaning. |

## Disputed Terms of the '171 Patent

| Language of Disputed Priority Term of Claims | RIM's proposed Construction | Kodak's Proposed Construction | Judge's Construction |
|---|---|---|---|
| "fraternization" | "association in an intimate way" | No construction required. | No construction required. Term is to be given its usual meaning. |
| "fraternizating" | "associating in an intimate way" | No construction required. | No construction required. Term is to be given its usual meaning. |