**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SECURUS TECHNOLOGIES, INC., | |
|     Plaintiff, | CIVIL ACTION NO. 3:13-cv-03009-K |
| v. | (JURY DEMANDED) |
| GLOBAL TEL*LINK CORPORATION, | |
|     Defendant. | |

**GLOBAL TEL*LINK'S OPPOSITION TO SECURUS'S MOTION FOR JUDGMENT**
**ON THE PLEADINGS THAT THE COUNTERCLAIM PATENTS ARE**
**INVALID FOR FAILING TO COMPLY WITH 35 U.S.C. § 101**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 3

ARGUMENT .................................................................................................................... 5

I.    GTL's Patents Are Directed To Concrete Enhancements To Inmate
      Telecommunications Systems, Not Abstract Ideas ............................................. 6

II.   GTL's Patent Claims Are Sufficiently Detailed To Avoid Disproportionately
      Preempting The Use of An Abstract Idea ......................................................... 12

      A.   The Patent Claims Do Not Preempt All Ways of Determining Whether an
           Inmate Has Had Unauthorized Communications. ....................................... 12

      B.   The Patent Claims Are Not About Automating a Pre-Existing Process
           Using a Computer. ...................................................................................... 16

      C.   Underlying Factual Disputes About the Claimed Inventions Preclude
           Granting Securus's Motion. ......................................................................... 18

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)...................................................... *passim*

*Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, Nos. SACV 11-00189, 13-00720
    AG (RNBx), 2014 WL 7012391 (C.D. Cal. Nov. 12, 2014)............................................10

*Bilski v. Kappos*, 561 U.S. 593 (2010)..................................................................................7

*Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13 C 6339, 2014 WL 4922524
    (N.D. Ill. Sept. 29, 2014) ............................................................................................19

*CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013) ....................................14

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) .....................6, 7, 8, 9,
    11, 12, 16

*Diamond v. Diehr*, 450 U.S. 175 (1981)..................................................................8, 11, 15, 17

*Gottschalk v. Benson*, 409 U.S. 63 (1972).........................................................................6, 15

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305
    (5th Cir. 2002)..............................................................................................................2

*Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74 (5th Cir. 1990) ...............2

*Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899 (5th Cir. 2002) .........2

*Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12-10943-FDS, 2015 WL 1943826
    (D. Mass. Apr. 28, 2015) ...........................................................................................5, 19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) ........6, 7, 10, 12, 16

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Nos. 14-732-RGA et al., 2015 WL
    1744343 (D. Del. Apr. 15, 2015) ..............................................................................10

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) ............................................5

*Rubber-Tip Pencil Co. v. Howard*, 87 U.S. 498, 20 Wall. 498 (1874).........................10

*TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 651935
(E.D. Tex. Feb. 19, 2014) .............................................................................14, 15, 17, 19

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA LLC*, No. 13 C 4417, 2014
WL 983123 (N.D. Ill. Mar. 13, 2014).................................................................................5

## STATUTES AND RULES

35 U.S.C. § 101 ..................................................................................................... *passim*

Fed. R. Civ. P. 12 ............................................................................................11, 18, 19

Fed. R. Civ. P. 12(c) .................................................................................................2

Counterclaim defendant Securus Technologies, Inc. ("Securus") argues that two of counterclaim plaintiff Global Tel*Link Corporation's ("GTL") patents are invalid because the patent claims do not contain patentable subject matter, as required by 35 U.S.C. § 101.  Securus is wrong.

Securus's methodology for attacking the patent eligibility of GTL's inventions is fatally flawed.  Securus creates a high-level (and incorrect) description of the goals of GTL's patents, stripping out the technology and any details of the inventions.  Having set up this straw man, Securus then proceeds to knock it down by arguing that its own abstract description is—unsurprisingly—no more than an abstract idea.  That is not how patent-eligibility analysis works; if it were, the prohibition on patenting abstract ideas would "swallow all of patent law." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014).

Securus characterizes (at 3, 12) GTL's patents as describing systems and methods for "determining whether an inmate has had unauthorized communications."  That description is incorrect.  The patents are not concerned with preventing unauthorized calls; they are concerned with generating useful intelligence from calls that can be used to aid investigations of unlawful or improper conduct.  Indeed, calls made by inmates associated with security threat groups are overwhelmingly *authorized* calls, not unauthorized calls, and the patents describe systems and methods for analyzing vast numbers of inmate calls, together with other sources of information, in order to detect patterns of gang activity and inmate-employee fraternization.  Moreover, the patents specifically describe how that analysis occurs.  Securus's inability, even after two years of litigation, to identify an abstract idea to which GTL's patents might plausibly be directed, suggests strongly that the patents are not directed to an abstract idea.

Unlike the claims held patent-ineligible in such cases as *Alice*, the present claims do not merely recite the performance of some business practice known from the pre-computer world along with the requirement to "just do it on a computer."  This is *not* a case of merely automating processes that were being done previously by hand.[1]  Instead, the claimed solutions here integrate computer technology into a physical system with myriad elements to overcome specific problems arising in the realm of prison telecommunications systems, thus allowing such telecommunications systems to become tools for identifying emerging gang-related activity and identifying prison employees who are fraternizing with prisoners.

Furthermore, even if Securus could identify an abstract idea to which the patents are directed, its argument would still fail because Securus has not shown that the patents disproportionately preempt the public's ability to use any abstract idea.  Far from preempting all efforts to determine whether an inmate has had an unauthorized communication (as Securus would have it), the claimed inventions make the phone system more valuable to correctional facilities by turning it into a tool for solving security problems.  And far from preempting all ways to solve those security problems, the claims recite specific techniques to solve them, leaving other techniques unclaimed.  The result is a more capable phone system that helps combat prison gang violence, smuggling of contraband, criminal conspiracies, and other offenses.  GTL's patents are by law presumed valid; it is Securus's burden to overcome that presumption by clear and convincing evidence, and Securus has failed to do so.

---

[1] GTL does not understand Securus to dispute that factual issue, but to the extent that material facts are in dispute, Securus's Rule 12(c) motion must be denied.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (A motion brought under Rule 12(c) "'is designed to dispose of cases where the material facts are not in dispute . . . .'") (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)); *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002) ("[J]udgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain.").

## BACKGROUND

GTL's patents—U.S. Patent Nos. 7,085,359 ("the '359 patent") and 7,039,171("the '171 patent")—claim enhancements to an inmate telecommunications system.  Generally, the inventions describe systems that physically integrate with an inmate telecommunications system and use information generated by such telecommunications systems to enhance the security of a correctional institution and aid investigations of crime and inappropriate inmate activity.

Prior to the inventions, correctional facilities had various disparate data sources available to them about, for example, inmates, security threat groups, and correctional employees.  *See, e.g.*, '359 patent 1:32-49, 3:66-4:13; '171 patent 4:26-47.  That data, however, was not being used in combination with the inmate telephone systems to generate intelligence that could enhance prison security.  A core "inventive concept" that the inventors of the '171 and '359 patents had was to physically integrate specific sources of information available to correctional facilities with the inmate telecommunications system to generate a very specific type of actionable intelligence about undesirable inmate activity—inmate gang activity and inmate-employee fraternization.  *See* '359 patent 1:23-2:10; '171 patent 1:27-2:14.  The inventors achieved that high-level goal by selecting specific data that was available to correctional facilities and integrating that data in a very specific way with the inmate telecommunications systems.

The claims of the '171 and '359 patents appropriately reflect the narrowness of that inventive concept.  The claims recite the integration and use of specific types of information with an inmate telecommunications system.  Claim 14 of the '359 patent, for example, recites integrating information regarding security threat groups and information about inmates who are affiliated with such groups with an inmate telephone system's communication detail records

("CDRs")—which are a specific type of electronic record created by such a system. Similarly, claim 9 of the '171 patent describes integrating databases with information about inmates and information about correctional employees with the "monitoring module" of an inmate telecommunications system. As described in claim 15 of that patent, the monitoring module could be the part of the inmate telecommunications system that produces call detail records. Thus the "monitoring module" of the '171 patent's claims and the "call/communication detail records" of the '359 patent's claims describe the point of physical integration between the inmate telephone system and the other sources of information that were not previously integrated with those telephone systems. Figure 2 of the '171 patent illustrates how the inventors conceived various data sources and processing equipment would be integrated with an inmate telephone systems through that system's CDR Database:



Accordingly, GTL's patents do not cover integrating any other source of information with an inmate telephone system. Nor do they cover using any of the claimed information or

inmate telephone systems for generating other types of intelligence beyond identifying gang-related telephone calls and inmate-employee fraternization.

The claims also do not cover the fundamental idea of "comparing a first piece of information to a database of information" as Securus asserts (at 6). Although the inventions make use of such comparisons, the claims do not claim such comparisons in the abstract. Instead, the claims describe use of the comparisons as a way to utilize the data from the integrated data sources to generate actionable intelligence. Nor is it plausible, as Securus implies (at 6-7), that the claims cover "dining at a reservations-required restaurant," facility access authentication, or police checking license-plate numbers. The claims instead contain a number of key limitations that limit the invention to a particular context (correctional facilities), a particular architecture (the integration of databases with an inmate phone system), and particular applications (the detection of security-threat-group communication activity and the detection of electronic inmate-employee communications).

## ARGUMENT

Every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). "Thus, if unpatentability is raised as an affirmative defense under rule 12, dismissal is appropriate only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense" by clear and convincing evidence. *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12-10943-FDS, 2015 WL 1943826, at *2 (D. Mass. Apr. 28, 2015) (internal quotation marks omitted); *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA LLC*, No. 13 C 4417, 2014 WL 983123, at *2 (N.D. Ill.

Mar. 13, 2014) (same).  Securus does not acknowledge this heavy burden in its motion, much less meet it.

The Supreme Court has set forth a two-step test that Securus must meet by clear and convincing evidence to prove that GTL's patents' claims are invalid for failing to comply with § 101.  *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012).  First, given the nature of the patented inventions, Securus must prove that the claims at issue are directed to an abstract idea.  *See Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).  Only if the claims are directed to an abstract idea can Securus continue to the second step of the test.  *See Alice*, 134 S. Ct. at 2355.  In the second step, Securus must prove that the elements of each claim—both individually and as a combination—do not transform the claim into a patent-eligible application of that abstract idea.  *Id*.  The goal of this second step is to determine whether the claim contains enough additional elements beside the abstract idea to avoid the "'risk [of] disproportionately tying up the use of the underlying' idea[]."  *Id.* at 2354 (quoting *Mayo*, 132 S. Ct. at 1294).  Securus fails to meet either step of the test.

## I.      GTL's Patents Are Directed To Concrete Enhancements To Inmate Telecommunications Systems, Not Abstract Ideas

**1.**  GTL's patents are not merely directed to abstract ideas; they cover specific and relatively narrow enhancements to inmate telecommunications systems.  Although the Supreme Court has not "delimit[ed] the precise contours of the 'abstract ideas' category," *Alice*, 134 S. Ct. at 2356-57, over the course of several cases the Court has provided some clear examples of abstract ideas.  For example, the Court has held that mathematical algorithms, including those executed on a generic computer, are abstract ideas.  *See Gottschalk v. Benson*, 409 U.S. 63, 65 (1972).  Fundamental economic and conventional business practices also count as abstract ideas.

*See Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (finding the "fundamental economic practice" of hedging to be patent ineligible) (internal quotation marks omitted); *Alice*, 134 S. Ct. at 2356 (same for "intermediated settlement").  Similarly, fundamental laws of nature cannot be patented.  *Mayo*, 132 S. Ct. at 1293.

GTL's patents do not fall into any of those categories.  As described above, the '359 patent claims an enhancement to an inmate telecommunications system that allows prison officials to identify calls to or from gang members.  The '171 patent claims an enhancement to an inmate telecommunications system that allows officials to identify calls between inmates and employees.  Put another way, the patents accomplish their goals by physically integrating disparate data sources with an inmate telecommunications system to analyze telephone call records to detect problems unique to prisons.  This is not an abstract idea, but is similar to other inventions that courts have held are patent eligible.

For example, in *DDR Holdings* the Federal Circuit was confronted with an invention to solve the "problem of retaining website visitors that, . . . would be instantly transported away from a host's website after 'clicking' on an advertisement." 773 F.3d at 1257.  The patent claimed a computer system configured so that, "upon the click of an advertisement for a third-party product displayed on a host's website, the visitor is no longer transported to the third party's website," but is sent instead to an "automatically-generated hybrid web page that combines visual 'look and feel' elements from the host website and product information from the third-party merchant's website related to the clicked advertisement." *Id.*  The Federal Circuit ruled that the patent was not directed to an abstract idea under the first step of the patent-eligibility test because it did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the

claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id. See also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (specific application of an equation to curing rubber was eligible).

As in *DDR Holdings,* the claimed solutions in GTL's patents are "necessarily rooted" in telecommunication system technology "in order to overcome a problem specifically arising in the realm" of prison telecommunications systems. *DDR Holdings*, 773 F.3d at 1257. Descriptions of prison telecommunications systems are found throughout the patents. In the "field of invention" section, for example, both patents describe systems conducting analysis based upon "telephone call activities" of inmates. '359 patent 1:13-17; '171 patent 1:16-23. As the patents state, the expansion of telecommunications systems in prisons gave inmates the ability to easily communicate with gang members or prison employees. *See* '359 patent 1:37-41; '171 patent 2:1-4. The expansion of telecommunications systems also led to inmates collectively making "hundreds of thousands of telephone calls," making it impossible to monitor these calls either manually or with pre-existing technology. *See* '359 patent 1:25-27; '171 patent 1:66–2:4. To solve those problems, figures 1 and 2 of both patents illustrate networked systems with various integrated servers and databases. And even the Patent Office thought the patents related to improvements in telecommunications systems, assigning each patent to class 379 for examination, a class that relates to telephonic communications. [2] '171 patent [52]; '359 patent [52]. [3] By solving these problems specifically arising due to the technology, GTL's patents

---

[2] The Patent Office's Classification Definitions are available at http://www.uspto.gov/web/offices/ac/ido/oeip/taf/moc/379.htm.

[3] This is in contrast to the patents held ineligible in *Alice*. Those patents—U.S. Patent Nos. 5,970,479; 6,912,510; 7,149,720; and 7,725,375—were in class 705, which the PTO describes as data processing for "financial business practice, management, or cost/price determination." http://www.uspto.gov/web/offices/ac/ido/oeip/taf/def/705.htm.

"effect an improvement in [a] technology or technical field" and are not merely directed to an abstract idea. *Alice*, 134 S. Ct. at 2359.

**2.**   Securus attempts to avoid the conclusion that an enhancement to a telephone system is not an abstract idea by describing the purported goals of GTL's patents at the highest level of abstraction, and by stripping out the technology and any details of the inventions.  Securus argues (at 12) that the two patents are directed to "determining if an inmate has had unauthorized communications."  This description of the patents is overly broad and plainly incorrect.  Indeed, the Court itself explained the invention disclosed in the '359 patent in much narrower terms when it stated that the invention  "is one that uses the connection between a known association of an inmate with a security threat group, information about the security threat group, and communication records to identify probable security threats."  *Markman* Memorandum Opinion and Order at 34 (Dkt. No. 134).

Securus's description fundamentally mischaracterizes the goals of GTL's patents.  The communications between inmates and other gang members that the '359 patent addresses are not necessarily unauthorized communications.[4]  The goal of the '359 patent is not to prevent communications, but rather to learn from them:  to generate actionable intelligence from telephone call records for the purpose of preventing criminal activity and promoting prison security.  *See, e.g.*, '359 patent 1:63-2:10, 2:43-58.  Securus's inability to correctly formulate an abstract idea embodied by the patents is itself a sufficient reason to reject Securus's motion.  *See DDR Holdings*, 773 F.3d at 1257 (rejecting § 101 challenge where "identifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea

---

[4] If the telephone calls were necessarily "unauthorized," one would expect the calls would not have been allowed in the first place because correctional facilities already had "control systems for processing inmate calls." *E.g.*, '359 patent 1:50-51.

cases"); *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, Nos. SACV 11-00189, 13-00720 AG (RNBx), 2014 WL 7012391, at *4 (C.D. Cal. Nov. 12, 2014) (rejecting § 101 challenge where the defendant had erroneously characterized the alleged abstract idea and stating that "[i]t is not the Court's role to develop winning theories for the parties").

Worse, under Securus's reasoning, the first step of the patent-eligibility analysis would be trivially satisfied in every case: "[i]f one looks at almost any patent from far enough away, it could arguably claim an abstract idea." *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Nos. 14-732-RGA et al., 2015 WL 1744343, at *5 (D. Del. Apr. 15, 2015). Inventions on new cars would become "ways to travel faster" and inventions on pharmaceuticals would become "making sick people feel better"—both patent-ineligible abstract ideas. But the Supreme Court warned against exactly this error in invalidating claims under § 101, "lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354.

"[A]ll inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S. Ct. at 2354. The key is distinguishing between patent claims that cover an unpatentable "idea of itself," *Rubber-Tip Pencil Co. v. Howard*, 87 U.S. 498, 507, 20 Wall. 498 (1874), versus the patentable "applications of such concepts to a new and useful end," *Alice*, 134 S. Ct. at 2354 (alterations omitted, internal quotation marks omitted). In this case, GTL's patents do not cover the broad idea of "determining if an inmate has had unauthorized communications," as Securus maintains. That is not even a correct description of the inventions in GTL's patents, but merely a mischaracterization of the problem that the inventions intend to solve—as explained above, calls from inmates associated with security threat groups are *not* unauthorized. GTL's patents cover a

telecommunication "system for monitoring, investigating, correlating, identifying and reporting potential inmate security threats from the telephone call activities of inmates." *E.g.*, '359 patent 1:16-19. This is an application with a new and useful end.

Securus asserts that the inventions could be run entirely on a general-purpose computer, but this argument ignores the aspects of the inventions that depend on and are intertwined with prison telecommunications systems. Even if Securus were correct, however, its assertion is irrelevant. Neither the Supreme Court nor the Federal Circuit has held that the mere fact that a patented invention could be implemented on a general purpose computer is sufficient to preclude patent eligibility. Such a holding would be inconsistent with the Supreme Court's decision in *Diehr* and the Federal Circuit's decision in *DDR Holdings*. If the law were as Securus asserts in its brief, there could be no patents covering inventions that improve computer technology and software, no matter how innovative.

Securus also asserts that the claims of GTL's patents could be performed mentally using paper files. That is simply untrue, and again ignores the aspects of the invention that incorporate prison communications systems. Mental steps and paper files cannot be used to monitor inmate phone calls or to generate and store call detail records ("CDRs"), which are a specific type of electronic record generated by a telecommunications system and which are a fundamental part of GTL's patents. Securus does not (and, on a Rule 12 motion, cannot) present expert testimony or other evidence regarding the underlying facts about how phone calls are monitored, what CDRs are, and whether the patented invention could be carried out with a pen and paper. For purposes of the present motion for judgment on the pleadings, however, the very existence of these material factual disputes demands denial of the motion. *See supra* note 1.

## II.    GTL's Patent Claims Are Sufficiently Detailed To Avoid Disproportionately Preempting The Use of An Abstract Idea

It is unnecessary to reach the second step of the patent-eligibility analysis, because Securus has failed to articulate an abstract idea to which the patents in suit are directed.  But even if Securus were right about its straw-man characterization of the patented inventions— which it is not—it cannot satisfy the second step of the Supreme Court's test.  Securus has failed to demonstrate that the claims do not contain an "inventive concept," i.e., some element or combination of elements sufficient to ensure that the claims in practice amount to "significantly more" than a patent on an ineligible concept.  *Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1293-94.

### A.    The Patent Claims Do Not Preempt All Ways of Determining Whether an Inmate Has Had Unauthorized Communications.

The Federal Circuit provided further guidance on step two of the patent-eligibility analysis in *DDR Holdings*.  773 F.3d at 1257.  The patent in that case covered generating a web page that combined the host website with product information from a third-party merchant's website.  *See id.*  The Federal Circuit held that the fundamental inquiry in step two is whether the claims "include 'additional features' that ensure the claims are 'more than a drafting effort designed to monopolize the [abstract idea].'"  *Id.* at 1259 (quoting *Alice*, 134 S. Ct. at 2357) (alteration in original).  The Court found that

> the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same…. Rather, they recite a specific way to automate the creation of a composite web page by an "outsource provider" that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet.

*Id.*  Thus, the Federal Circuit held that the claims contained an "inventive concept" that made the claims patent eligible.  *See id.*

Even accepting Securus's incorrect characterization of the '171 and '359 patents as directed toward "determining if an inmate has had unauthorized communications," the claims of the patents add significant narrowing detail so as to "ensure that [each] patent in practice amounts to significantly more than a patent upon [determining if an inmate has had unauthorized communications]." *Alice*, 134 S. Ct. at 2355 (internal quotation marks omitted). First, the claims are limited to only certain types of supposedly unauthorized communications (i.e., related to a security threat group or a correctional officer). Second, the claims are limited to only electronic communications (e.g., telephone calls). Third, the claims require that calls be monitored and that certain types of information be stored and used to generate the associated intelligence regarding security threat groups or fraternization. Finally, the claims require the performance of certain actions depending on what the analysis shows, such as notifying correctional officers when certain types of activity are detected. *E.g.*, '171 patents claims 9, 10; '359 patent claims 7, 17.

Those narrowing details are not a draftsman's ploy to monopolize Securus's alleged abstract idea. In light of those narrowing details that are apparent from the face of the claims, it is clear that there are other ways of "determining if an inmate has had unauthorized communications" that are not covered by the '171 or '359 patents, which further demonstrates that GTL's patents do not tie up that alleged abstract idea. To cite just some examples, GTL's patents do not cover analyzing the contents of calls; they do not cover determining if an inmate has made unauthorized and harassing calls to judges, prosecutors, or witnesses; they do not cover determining if an inmate has made unauthorized calls using the stolen account information of another inmate; they do not cover determining if an inmate has circumvented control measures associated with the inmate telephone system; they do not cover using closed-circuit TV cameras,

microphones in prison cells, or reports from confidential informants; they do not cover ways of detecting contraband cell phones; and they do not cover detecting inmate-employee fraternization by examining employee-initiated communications.

In sum, GTL's patent claims do not attempt to monopolize all telecommunications systems that allow prison officials to identify calls to or from gang members or to identify calls between inmates and employees.  And they certainly do not preempt all ways of performing the "abstract idea" that Securus puts forward: "determining if an inmate has had unauthorized communications."  Nor could the claims pre-empt all ways of "comparing a first piece of information to a database of information," as Securus at one point suggests (at 5-6).  Rather, the patent claims call for specific types of information, including electronic information *derived from an inmate phone system* (e.g., call detail records) from *more than one* database[5] to be analyzed in order to detect patterns of inmate calling activity.  There are many, many different ways of "comparing a first piece of information to a database of information" that do not fall within the scope of the claims.

This case is similar to *TQP Development, LLC v. Inuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014) (Bryson, J.), where the court found that claims directed to a method of changing encryption key values in a communication system were patent eligible under § 101.[6]  The patent in *TQP* "involve[d] a method for changing data in a way that

---

[5] Indeed claim 5 of the '359 patent requires the analysis of four different sources of information: (1) first information regarding security threat groups, (2) second information regarding inmates known to be affiliated with such groups,  (3) third information regarding each inmate associated with a correction facility, and (4) call detail records from the inmate telephone system.

[6] Although Judge Bryson's opinion in *TQP* issued prior to the Supreme Court's decision in *Alice*, it also issued *after* the Supreme Court's decision in *Mayo*, where the Court first set forth the two-step analysis for eligibility under § 101.  The *TQP* opinion also applied the plurality's test from *CLS Bank International v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013) (en banc), which is

will affect the communication system itself, by making it more secure." *Id.* at *7.  Similarly here, GTL's patents set forth systems and methods for changing data in a way that makes prisons and prison telephone systems more secure by detecting undesirable inmate behavior.  Although the court in *TQP* found that the patent embodied an abstract idea—using "the number of blocks of data transmitted, to trigger the generation of new key values used for encryption and decryption in a data communication system"—it found the patent eligible under § 101 because that generic concept was *"also specific to a particular technological field—that of data encryption."  Id.* at *3.  GTL's patents also are specific to a particular technological field—that of inmate telephone systems—and therefore do not disproportionately preempt the field, including other ways of integrating information with a prison telephone system or other ways of detecting inmate gang activity or inmate-employee fraternization.  Rather, like the patents in *TQP*, GTL's patents apply to a "very specific" implementation scenario, and therefore contain an "inventive concept." *Id.* at *4.  GTL's patents describe very specific ways to compare data and modify an inmate telecommunications system so as to detect gang activity and inmate-employee fraternization.  Such a system is "a far cry from something that could fairly be characterized as a 'basic tool[ ] of scientific and technological work.'" *Id.* at *4 (quoting *Gottschalk*, 409 U.S. at 67) (alteration in original).  *See also Diehr*, 450 U.S. at 185-88 (explaining that although an abstract idea in the form of an equation is not patentable in isolation, the patent was eligible under § 101 because it only "foreclose[d] from others the use of that equation in conjunction with all of the other steps in" the claimed process.)

---

indistinguishable from the test applied in *Alice* because both apply the framework set forth in *Mayo*.  Put simply, *TQP* is fully consistent with *Alice*.

**B.     The Patent Claims Are Not About Automating a Pre-Existing Process Using a Computer.**

Securus argues (at 18) that the claims fail the second step by likening them to claims that merely cover "implement[ing an] abstract idea . . . on a generic computer." *Alice*, 134 S. Ct. at 2359.  To be sure, a claim to an abstract idea is not made patent eligible simply by reciting that the idea is performed on a generic computer.  But that is not this case.

Unlike the claims addressed by the Supreme Court in *Alice*, the claims in this case do not take an age-old process and add the words "apply it with a computer."  *See* 134 S. Ct. at 2358.  Instead, like the claims in *DDR Holdings*, the claims here "incorporate[] elements from multiple sources in order to solve a problem"—in this case, elements associated with telecommunications systems in prisons.  773 F.3d at 1259.  Those components are called out in specific, narrow claim limitations that describe concrete components such as CDR databases and monitoring modules.  *See supra* at 3-4.  Securus does not discuss any of those claim limitations, but instead brushes them aside as "conventional computer components."  Mot. at 18.  Securus, therefore, fails to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1298, 1297).

Securus also fails to address the how, if at all, GTL's patent claims preempt any abstract idea—which they don't, as described above.  Preemption, however, is the touchstone of a § 101 analysis.  *See Alice*, 134 S. Ct. at 2358 ("[T]he pre-emption concern . . . undergirds our § 101 jurisprudence."); *see also id.* at 2354.  Securus instead focuses on statements from the patents' specifications that the algorithms in the patent figures may be "implemented as software executed on a programmed general purpose computer."  *See* Mot. at 19.  But "a claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a . . .

computer program[] or digital computer." *Diehr*, 450 U.S. at 187.  In other words, while adding computer implementation to an otherwise abstract idea does not confer patent eligibility under *Alice*, the mere fact that a patentable idea can be implemented on a generic computer does not foreclose patent eligibility.

Accordingly, Securus's argument might make sense if GTL's patents took long-existing methods and disclosed using computers to carry out those methods—that is, if a computer implementation supplied the supposed "inventive concept."  But GTL's patents are not that type of patent.  Instead, the inventive concept in the '359 and '171 patents is inextricably intertwined with the inmate telephone system.  At its core, the inventive concept was the idea to integrate various existing sources of information, including information derived from monitoring inmate phone activity, into a single integrated telephone system so that the information could be analyzed to generate new and useful information about particular undesirable inmate activities. Before the invention of the '171 and '359 patents, correctional facilities had not figured out how to extract useful intelligence from disparate sources of information or to leverage their phone systems to combat security threats.  The inventors of GTL's patents came up with very specific ways to use available information and information generated by inmate telecommunications systems to generate actionable intelligence.  It is impossible to disentangle that inventive concept from the claims when those claims are viewed as an "ordered combination," as demanded by *Alice*.  Moreover, even though the enhancements to inmate phone systems described by GTL's patents are "device agnostic," it is apparent from the patent that computing devices, monitoring modules, databases, and other specialized equipment associated with an inmate telephone system "would be required for all but the most fanciful uses of the invention."  *TQP*, 2014 WL 651935, at *5 (Bryson, J.).

Securus's approach is especially problematic with respect to its analysis of the dependent claims. Aside from reciting language from the dependent claims (at 14-17), Securus does not substantively address the limitations added by those claims. It instead declares (at 14, 16) that the dependent claims "simply provide specific examples of the type of information or actions in the broader claims." But those "specific examples" provide precisely the type of narrowing limitations that ensure a claim "amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (alteration in original, internal quotation marks omitted). By stating that GTL's dependent claims cover only "specific examples" of a putative abstract idea, Securus tacitly acknowledges that GTL's dependent claims do not tie up an entire abstract idea and are therefore eligible under § 101.

### C.   Underlying Factual Disputes About the Claimed Inventions Preclude Granting Securus's Motion.

The above-discussion of the "inventive concept" in GTL's patents also illustrates why Securus's motions should not be resolved in the procedural posture of Rule 12. Securus repeatedly and incorrectly takes contrary, factually unsupported positions about what GTL's patents "describe" (at 2, 5-6), what the patents "[f]undamentally" cover (at 6), whether the patents use "age-old concept[s]" (at 7), whether the patents "add only basic electronic implementation accomplished by a general-purpose computer" (at 18), and whether the inventions could be performed mentally with paper records (at 2, 6, 18-19). At the pleading stage, however, the Court is left merely with Securus's attorney argument about those disputed facts. The Court has been given no opportunity to evaluate, for example, inventor or expert testimony about what the "inventive concept[s]" in GTL's patents are, or about the extent to which phone monitoring and storing of call detail records are central to the invention. The Court cannot simply assume that Securus's unsupported assertions about the facts relating to the

invention are accurate.  Such factual matters cannot be resolved on a motion for judgment on the pleadings, and courts in similar situations have denied Rule 12 motions on that basis.  *See Kenexa*, 2015 WL 1943826, at *7 ("whether the claims would pre-empt the [abstract idea] displayed in defendants' charts is, at least in part, a factual question that cannot be resolved at this stage"); *Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13 C 6339, 2014 WL 4922524, at *2 (N.D. Ill. Sept. 29, 2014) ("[D]ismissal [under Rule 12] is appropriate solely when the only plausible reading of the patent is that there is clear and convincing evidence of ineligibility."); *see also TQP*, 2014 WL 651935, at *5 (whether a step of the claimed method could be performed mentally was a "factual question that would have to be resolved before the Court could grant summary judgment" under § 101).  Because there are—at a minimum— plausible reasons that GTL's patents satisfy § 101, Securus's motion for judgment on the pleadings should be denied.

## CONCLUSION

GTL's patents claim specific, concrete enhancements to telecommunications systems that are adapted for a specific use in correctional institutions—the type of technology that has been the subject of countless patents.  Thus, Securus fails to demonstrate by clear and convincing evidence that the patent claims fail to comply with 35 U.S.C. § 101, and its motion should be denied.

Dated:  August 21, 2015

Respectfully submitted,

/s/ *J.C. Rozendaal*
J.C. Rozendaal (*pro hac vice*)
Courtney S. Elwood (*pro hac vice*)
Evan T. Leo (*pro hac vice*)
Christopher C. Funk (*pro hac vice*)
Nicholas O. Hunter (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

E. Leon Carter
Texas State Bar No. 03914300
lcarter@carterscholer.com
John Steven Torkelson
Texas State Bar No. 00795154
jtorkelson@carterscholer.com
Linda R. Stahl
Texas State Bar No. 00798525
lstahl@carterscholer.com
CARTER SCHOLER ARNETT
   HAMADA & MOCKLER PLLC
8150 N Central Expressway
Fifth Floor
Dallas, TX 75206
Tel: (214) 550-8188
Fax: (214) 550-8185

*Counsel for Defendant and Counterclaim
Plaintiff Global Tel\*Link Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2015, GTL electronically filed the foregoing
document with the Clerk of the Court, using the CM/ECF system, which will send certification
of such filing to all counsel of record.


   /s/ *J.C. Rozendaal*